UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN R. T.,<br><br>                              Plaintiff,<br><br>v.<br><br>KILOLO KIJAKAZI, Acting<br>Commissioner of Social Security,<br><br>                              Defendant. | Case No.:  20cv2257-KSC<br><br>**ORDER GRANTING PLAINTIFF'S<br>REQUEST FOR REVERSAL AND<br>REMAND [Doc. No. 15] AND<br>DENYING DEFENDANT'S<br>REQUEST FOR AFFIRMANCE OF<br>THE COMMISSIONER'S FINAL<br>DECISION [Doc. No. 18]** |

On November 19, 2020, plaintiff Steven R. T. commenced an action pursuant to Title 42, United States Code, Section 405(g), against Andrew M. Saul,[1] the Commissioner of Social Security, seeking review of a final adverse decision of the Commissioner. [Doc. No. 1.]  Currently before the Court is plaintiff's Merits Brief seeking a reversal and remand of the Commissioner's final decision.  [Doc. No. 15.] Defendant has filed an Opposition to plaintiff's Merits Brief arguing that the Commissioner's final decision should be affirmed because it is supported by substantial

---

[1]     Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi, who became the Acting Commissioner of Social Security on or about June 9, 2021, is automatically substituted in place of Andrew Saul as the defendant in this suit.

1

1    evidence and free of legal error.  [Doc. No. 18.]  Plaintiff also filed a Reply to

2    defendant's Opposition.  [Doc. No. 19,]  For the reasons outlined more fully below, the

3    Court finds that plaintiff's request for a reversal and remand must be GRANTED [Doc.

4    No. 15], and defendant's request for affirmance of the final decision of the Commissioner

5    must be DENIED [Doc. No. 18.]

6    *I.*    ***Background and Procedural History.***

7        Plaintiff filed an application for Social Security disability insurance benefits on

8    March 2, 2018, alleging he was disabled as of March 27, 2017, and had stopped working

9    on this date because of his medical condition.  [Doc. No. 11-5, at p. 2; Doc. No. 11-6, at

10   pp. 9, 13.]  At this time, plaintiff's claimed medical conditions included depression;

11   anxiety; back pain; right and left leg pain; and high blood pressure.  [Doc. No. 11-6, at

12   p. 13.]  Plaintiff's application for benefits was denied on July 10, 2018.  [Doc. No. 11-4,

13   at pp. 2-5.]  He then submitted a request for reconsideration on September 11, 2018,

14   which was denied on October 15, 2018.  [Doc. No. 11-4, at pp. 6, 10-14.]

15       On October 24, 2018, plaintiff requested a hearing, and a hearing was then held

16   before an ALJ on October 15, 2019.  [Doc. No. 11-4, at pp. 15-16; Doc. No. 11-2, at

17   p. 31.]  At the hearing, plaintiff amended the date he allegedly became disabled to

18   October 1, 2017.  [Doc. No. 11-2, at p. 34.]  In a written decision dated March 20, 2020,

19   the ALJ concluded plaintiff is not eligible for disability benefits, because he was not

20   disabled under Social Security regulations from October 1, 2017, his alleged date of

21   onset, through the date of the ALJ's decision.  [Doc. No. 11-2, at p. 27.]  Plaintiff then

22   requested review of the ALJ's decision by the Appeals Council, but the Appeals Council

23   concluded in a letter dated September 21, 2020, that there was no basis for changing the

24   ALJ's decision.  [Doc. No. 11-4, at pp. 64-66; Doc. No. 11-2, at pp. 2-4.]  Therefore, the

25   ALJ's denial became the final decision of the Commissioner.

26       On November 19, 2020, plaintiff filed his Complaint in this action seeking review

27   of the ALJ's decision.  [Doc. No. 1.]  Plaintiff then filed a Consent to jurisdiction for all

28   purposes by the undersigned Magistrate Judge.  [Doc. No. 4.]

## II.    *Standards of Review.*

The final decision of the Commissioner must be affirmed if it is supported by substantial evidence and if the Commissioner has applied the correct legal standards. *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). Under the substantial evidence standard, the Commissioner's findings are upheld if supported by inferences reasonably drawn from the record. *Id.* If there is evidence in the record to support more than one rational interpretation, the District Court must defer to the Commissioner's decision. *Id.* "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001).  "In determining whether the Commissioner's findings are supported by substantial evidence, we must consider the evidence as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

## III.    *The Administrative Record.*

### A.    *Summary of the Administrative Hearing.*

At the administrative hearing, the ALJ heard testimony from plaintiff and from Nelly Katsell, a vocational expert.  [Doc. No. 11-2, at p. 33.]  Plaintiff was represented by counsel at the hearing, and counsel indicated the record was complete.  [Doc. No. 11-2, at pp. 33-34.]  According to counsel, plaintiff suffers from severe bilateral osteoarthritis of his hips; "lumbar stenosis with objective evidence of severe disc disease;" depression; anxiety; and obesity; and, as a result, he can no longer perform his past work as a commercial truck driver.  [Doc. No. 11-2, at p. 35.]  In addition, counsel indicated plaintiff's doctors have limited him to lifting no more than ten pounds and "want him to have the ability to alternate" between sitting and standing.  [Doc. No. 11-2, at p. 35.] Counsel also said plaintiff was using a prescribed walker and had been recommended for back surgery if he is able to lose weight.  [Doc. No. 11-2, at p. 35.]

/ / /

/ / /

1

### 1. *Plaintiff's Testimony.*

2      Plaintiff testified that he found out he had rheumatoid arthritis in his hips at a

3 doctor's appointment on October 3, 2019. Prior to that he did not realize he had a

4 problem with his hips. Rather, he had pain in his lower back and trouble with walking.

5 [Doc. No. 11-2, at p. 39.] At work he also had stress and anxiety caused by a supervisor

6 who was making unreasonable demands. [Doc. No. 11-2, at pp. 39-40.] Although he

7 could have called the union and requested a transfer to get away from the poor working

8 conditions, he did not do so for several reasons, including loss of seniority. [Doc. No.

9 11-2, at p. 45.] At one point he stopped working because of stress. However, he later

10 went back to work and finally left when he was unable to walk from the truck to the

11 lunchroom without hobbling. [Doc. No. 11-2, at pp. 45-46.]

12      Plaintiff testified he is not receiving workers compensation benefits but did receive

13 a check for $5,000 from workers compensation in 2019. At the time of the hearing, his

14 workers compensation claim was proceeding through arbitration. [Doc. No. 11-2, at

15 p. 42.]

16      Plaintiff acknowledged that his doctors have advised him to lose weight before

17 they consider back surgery. [Doc. No. 11-2, at p. 47.] Plaintiff's weight at the time of

18 the hearing was 375 pounds. [Doc. No. 11-2, at p. 48.]

19      Plaintiff testified he lives alone but has help loading groceries and getting them

20 into his home. He can drive a car. His activities include alternating between sitting,

21 standing, lying down, watching television, and reading. He is not able to take walks.

22 [Doc. No. 11-2, at pp. 48-49, 51.]

23      In response to questions by counsel, plaintiff testified he has radiating pain down

24 the sides of his legs and in his hips. [Doc. No. 11-2, at pp. 49-50.] He takes Meloxicam

25 for pain. [Doc. No. 11-2, at p. 50.] Because of back pain, plaintiff could not have

26 returned to work for a different company in October of 2017. Plaintiff takes Paxil and

27 Trazadone for anxiety, depression, PTSD, and sleep issues. [Doc. No. 11-2, at p. 51.] He

28 can sit for less than an hour and stand or walk for about 15 minutes. He cannot lift more

than 5 to 8 pounds.  It is very difficult for him to stoop and bend to put his socks and shoes on and he must use a shoehorn.  [Doc. No. 11-2, at p. 52.]  It is also very difficult for him to get in and out of a car.  He must use a walker or cane to move from one place to another to avoid falls.  [Doc. No. 11-2, at pp. 52-53.]

When questioned by the ALJ, plaintiff denied alcohol abuse and indicated that use of alcohol never interfered with his ability to work.  He did indicate he drinks alcohol "a little bit" to deal with pain and anxiety.  [Doc. No. 11-2, at pp. 53-54.]  He feels he is in control of his alcohol intake.  [Doc. No. 11-2, at p. 54.]

## 2.   *Vocational Expert's Testimony.*

The vocational expert testified that plaintiff's past work as a truck driver does not require skills that are transferable to "light work."  [Doc. No. 11-2, at p. 55.]  The ALJ presented the vocational expert with several vocational profiles from "less restrictive to more restrictive."  [Doc. No. 11-2, at p. 55.]  The first profile is "in line with" the opinions of the "state agency doctors" and a physical examination in the record – a claimant of plaintiff's age, education, and experience who is capable of medium exertion work and can frequently climb stairs and ramps, occasionally climb ladders or scaffolds, never climb ropes, frequently balance, stoop, and crouch, and occasionally crawl and kneel.  According to the vocational expert, persons with this profile could perform plaintiff's past relevant work as a truck driver.  [Doc. No. 11-2, at p. 55.]

On the other hand, persons with the above-described profile would not be able to perform work as a truck driver if they also had mental health problems that limited them to simple, routine tasks with only occasional interactions with supervisors, other workers, and the public.  [Doc. No. 11-2, at p. 56.]  Persons with this profile and these restrictions would be able to perform other medium work as, for example, a packager or a garment or laundry worker.  However, no work would be available to persons with this profile if they also had back pain and mental health symptoms of depression and anxiety that caused them to call in sick for two full days per month.  [Doc. No. 11-2, at pp. 56-57.]

/ / /

1       In a brief closing argument, plaintiff's counsel asked for the ALJ to consider that

2   the doctor who performed the examination used as a basis for the initial profile did not

3   have the "full picture" because an x-ray and MRI were not completed. As a result, this

4   doctor "missed the bilateral hip disease" that is supported by an x-ray. [Doc. No. 11-2, at

5   pp. 59-60.]

6       **B.**    ***Summary of Medical Opinions and Treatment Records.***

7       On March 27, 2017, plaintiff went to Urgent Care at Kaiser Permanente "feeling

8   overwhelmed" and complaining of insomnia, increased stress, and harassment at work.

9   He was given prescriptions for Xanax and Prinzide/Zestoretic, referred to psychiatry for

10   an evaluation of anxiety, and referred to occupational medicine to seek an extension of

11   time off for disability. [Doc. No. 11-7, at pp. 81-83.] The records from Kaiser indicate

12   plaintiff was treated in the psychiatry department for stress and anxiety, including group

13   therapy sessions, beginning March 27, 2017. [Doc. No. 11-7, at pp. 60, 65, 69, 81.] He

14   was scheduled to return to work on July 31, 2017. [Doc. No. 11-7, at p. 33.]

15       Later treatment notes from Kaiser Permanente dated September 20, 2017 indicate

16   plaintiff was "suspended" from work "last week." [Doc. No. 11-7, at p. 26.] On

17   September 27, 2017, plaintiff was being treated at Kaiser Permanente for pneumonia that

18   was not yet resolved, but he also complained of continuing work stress and a "hostile

19   environment" and said he likely would not be able to return to work. [Doc. No. 11-7, at

20   p. 24.] On October 2, 2017, plaintiff reported experiencing panic attacks, severe anxiety,

21   and worry. He was seeking additional time out of work on "state disability," because his

22   problems at work "got worse" after he returned to his job in July 2017. [Doc. No. 11-7,

23   at pp. 18-21.] At this time, additional medication and therapy were recommended, and

24   plaintiff was advised he would have to return to work after a brief extension of his

25   disability term. [Doc. No. 11-7, at pp. 13-21.]

26       Next, on October 10, 2017, plaintiff went to Urgent Care complaining of back pain

27   occasionally radiating down his legs. He stated the pain started "a couple weeks ago,"

28   and he believes it is related to his work as a truck driver and a change of the seat in his

truck by his employer.  [Doc. No. 11-7, at pp. 9-11.]  A physical examination at this time revealed normal lower extremity strength and no loss of motor strength.  [Doc. No. 11-7, at pp. 11-12.]  The examining physician indicated there was no reason to suspect conditions such as cord compression, cauda equina, or discitis.  A muscle relaxant and an anti-inflammatory medication were prescribed.  [Doc. No. 11-7, at p. 11.]

Glenn C. Nusbaum, a chiropractic doctor at Mission Valley Chiropractic Clinic, was retained on or about October 16, 2017, as plaintiff's primary treating physician in connection with a worker's compensation claim.  Plaintiff told Dr. Nusbaum he was experiencing constant low back pain (5 to 6 out of 10); pain, tingling, and numbness in his right leg on a frequent to constant basis; and daily intermittent pain in his left leg.  [Doc. No. 11-7, at p. 168.]  Dr. Nusbaum's initial report states that a "straight leg raising test was positive bilaterally."  [Doc. No. 11-7, at p. 169.]  Plaintiff had a limited range of motion in his lumbar spine, but his motor strength was 5 out 5.  Dr. Nusbaum requested authorization for eight chiropractic sessions, an MRI scan of the lumbar spine, and referral to an orthopedic specialist for appropriate medications.  He also said plaintiff should not lift more than ten pounds; bend repeatedly at the waist; or drive commercial vehicles and should be permitted to sit and stand as needed.  [Doc. No. 11-7, at p. 170.]

On November 1, 2017, Dr. Nusbaum examined plaintiff and completed an assessment form for the State of California.  [Doc. No. 11-7, at pp. 157-158.]  At this time, plaintiff reported constant lower back and lower extremity pain and described his lower back pain as a 5 to 6 on a 10 scale that increased to 7 or 8 out of 10 with performance of daily living activities.  [Doc. No. 11-7, at p. 157.]  The report also states in part as follows:  "There was pain over the lumbar and lumbrosacral paravertebral musculature.  Kemp's and Gaenslen's test were positive for back pain.  Straight leg raising test was positive bilaterally.  Dejerine's test was negative.  Lumbar spine ranges of motion [flex 30; ext 0; right bend 05; left bend 05].  Deep tendon reflexes were trace for patellar and absent for Achilles bilaterally. . . .  Motor strength evaluation revealed 5/5 strength for hip flexors, quadriceps, tibialis anticus, EHLs, peroneals, gastric-soleus,

and hamstrings.  The patient was able to heel and toe walk. . . ." [Doc. No. 11-7, at p. 157.]  Dr. Nusbaum's view was that plaintiff could return to modified work as of November 1, 2017 with no lifting over ten pounds; no repetitive bending; and no driving of commercial vehicles.  [Doc. No. 11-7, at p. 158.]

The record indicates that plaintiff lost his health insurance in early 2018 because he was no longer employed.  The final treatment note from Kaiser Permanente is dated January 23, 2018, when plaintiff was treated for an acute cough, congestion, and sore throat.  [Doc. No. 11-7, at pp. 4-8.]

Dr. Nusbaum examined plaintiff again on January 31, 2018, and he completed an assessment form for the State of California.  [Doc. No. 11-7, at pp. 161-162.]  Plaintiff reported constant low back pain rated at 5 to 6 on a scale of 10 that increased to 7 or 8 with performance of basic daily activities.  [Doc. No. 11-7, at p. 161.]  The report states in part as follows:  "There was pain over the lumbar and lumbrosacral paravertebral musculature.  Kemp's and Gaenslen's test were positive for back pain.  Straight leg raising test was positive bilaterally.  Dejerine's test was negative.  Lumbar spine ranges of motion [flex 30; ext 0; right bend 05; left bend 10].  Deep tendon reflexes were trace for patellar and absent for Achilles bilaterally. . . .  Motor strength evaluation revealed 5/5 strength for hip flexors, quadriceps, tibialis anticus, EHLs, peroneals, gastric-soleus, and hamstrings.  The patient was able to heel and toe walk. . . ." [Doc. No. 11-7, at p. 161.]  Dr. Nusbaum's view was that plaintiff could return to modified work on January 31, 2018, with no lifting over ten pounds; no repetitive bending; and no driving of commercial vehicles.  [Doc. No. 11-7, at p. 162.]

The record indicates plaintiff was examined on March 14, 2018 by Robert Fields, M.D., who prepared a "Panel QME Evaluation."  [Doc. No. 11-7, at p. 164.]  An original of this evaluation could not found in the record, but it is mentioned and summarized in other records.  [Doc. No. 11-7, at p. 164; Doc. No. 11-8, at pp. 19-20.]  When Dr. Field examined plaintiff on March 14, 2018, he noted that plaintiff had a "forward-flexed posture" and pain in "the lumbrosacral junction."  [Doc. No. 11-7, at p. 164.]  "Heel and

toe walk had weakness of great toe.  Motor exam was otherwise normal.  Extensor hallices was weak.  Tibialis anticus was normal.  Reflexes were absent in the patellar and Achilles.  He could not perform straight leg raising in a sitting position.  Straight leg raising was only 20 degrees. . . ."  [Doc. No. 11-7, at p. 164.]  Dr. Fields diagnosed "possible radiculopathy" and indicated plaintiff would need x-rays and an MRI of the lumbar spine.  [Doc. No. 11-7, at p. 164.]

In a report dated April 25, 2018, Dr. Nusbaum indicated plaintiff was referred to him on October 16, 2017 for treatment and evaluation because of a Workers' Compensation claim, but he was notified shortly after the initial evaluation that the claim had been denied.  However, he continued to follow up with plaintiff on several occasions.  He prepared the April 25, 2018 report at the request of plaintiff's attorney.  [Doc. No. 11-7, at p. 163.]  The physical examination section of Dr. Nusbaum's April 25, 2018 report states in part as follows:  "There was tenderness to palpation over the lumbar and lumbosacral paraspinal musculature.  Kemp's and Gaenslen's tests were positive for back pain.  Straight leg raising test was positive bilaterally. . . ."  [Doc. No. 11-7, at p. 164.]  Dr. Nusbaum also noted plaintiff had a limited range of motion in his lumbar spine, and "[d]eep tendon reflexes were absent for patellar and Achilles."  [Doc. No. 11-7, at p. 165.]  In addition, a "[m]otor strength evaluation revealed 4/5 strength for tibialis anticus.  Motor strength was 4/5 for EHLs.  There was 5/5 strength for quadriceps, peroneals, gastroc-soleus, and hamstrings."  [Doc. No. 11-7, at p. 165.]  Dr. Nusbaum requested authorization for an MRI scan and plain film radiographs of the lumbar spine and an orthopedic spine consultation.  In addition, Dr. Nusbaum's report states that plaintiff should not drive commercial vehicles; lift and carry more than ten pounds; or bend repetitively at the waist.  Lastly, Dr. Nusbaum said plaintiff should be allowed to alternate between sitting and standing on an as-needed basis in a work setting.  [Doc. No. 11-7, at p. 165.]

At the request of the Department of Social Services in connection with his claim for disability benefits, plaintiff was examined and evaluated by William Curran, M.D., a

Board-Certified Orthopaedist, on May 30, 2018, regarding his complaints of "[l]ow back pain radiating into the lower extremities." [Doc. No. 11-7, at pp. 118-119.]  In the opening comments of his report, Dr. Curran noted there were "[n]o orthopaedic records . . . available for [his] review;" the claimant "was deemed a credible historian;" no exaggeration was noted; and no "unusual behavior/movements" were observed in the examination setting.  [Doc. No. 11-7, at p. 119.]

Plaintiff told Dr. Curran he had lumbar spine surgery in 1997 but was "not under medical care at this time for his orthopedic complaints." [Doc. No. 11-7, at p. 120.]  He described the pain in his lower back and lower extremities as sharp, dull, throbbing, and burning and said the pain was worse with sitting, standing, walking, bending, lifting, getting dressed, and getting out of the shower.  [Doc. No. 11-7, at p. 120.]  Plaintiff did not use an assistive device; was able to get on and off the examination table without assistance; and did not appear to be in any acute or chronic distress.  Dr. Curran observed that plaintiff had normal posture and had no difficulty in rising on his toes and heels but "ambulated with a slow gait." [Doc. No. 11-7, at p. 121.]

The range of motion in plaintiff's joints were within normal limits, and there was no evidence of swelling or deformity in his hands, hips, knees, ankles, or feet.  [Doc. No. 11-7, at p. 121.]  The straight leg-raising test was negative bilaterally in the supine and sitting positions.  A motor evaluation essentially revealed normal strength in all major muscle groups of the upper and lower extremities.  [Doc. No. 11-7, at p. 122.]  No limitations were noted in plaintiff's cervical spine, but Dr. Curran's report states that plaintiff had limitations in flexion, extension, rotation, and lateral flexion in his lumbar spine.  "Diffuse tenderness" was noted in the lumbar spine.  [Doc. No. 11-7, at p. 122.] Dr. Curran did not request any radiographic studies to complete his evaluation.  [Doc. No. 11-7, at p. 123.]

Dr. Curran's impression was that plaintiff's activities would be limited by obesity; "[p]robable degenerative joint and disc disease lumbar spine;" and his prior lumbar spine surgery.  [Doc. No. 11-7, at p. 123.]  In Dr. Curran's view, plaintiff could lift and carry

50 pounds occasionally and 25 pounds frequently; stand or walk up to 6 hours in an 8-hour workday with normal breaks and without an assistive device; and sit for six hours out of an 8-hour workday with normal breaks and without having to alternate from sitting to standing to relieve pain or discomfort.  [Doc. No. 11-7, at pp. 123-124.]  In Dr. Curran's opinion, plaintiff did not need an assistive device, such as a cane, to ambulate.  In addition, Dr. Curran indicated plaintiff could climb ramps and stairs frequently; climb ladders, ropes, and scaffolds occasionally; bend occasionally at the waist; and squat, kneel, or crawl only occasionally "due to his limited lumbar spine motions and obesity."  [Doc. No. 11-7, at pp. 123-124.]

On June 14, 2018, a residual functional capacity assessment was completed based on available records by K. Vu, M.D., an agency orthopedic doctor, who concluded that plaintiff could occasionally lift and carry 50 pounds; frequently lift and carry 25 pounds; stand, walk, and sit for about 6 hours in an 8-hour workday; frequently balance, climb stairs, kneel, crouch, and bend at the waist (stooping); and occasionally crawl and climb ladders etc.  [Doc. No. 11-3, at pp. 11-13.]  Based on these findings, Dr. Vu, concluded plaintiff had the ability to perform his past work as a truck driver.  [Doc. No. 11-3, at p. 16.]

On June 28, 2018, Lisa Renner, M.D., an agency physician, reviewed available records regarding plaintiff's mental health and concluded he was "no more than moderately limited by mental factors alone."  [Doc. No. 11-3, at pp. 8-9.]  Specifically, it was Dr. Renner's view that plaintiff was moderately limited in his ability to maintain attention and concentration; understand and remember instructions; and work with others. [Doc. No. 11-3, at pp. 13-15.]  Based on records from treating physicians, Dr. Renner concluded plaintiff "is able to persist at tasks that can be learned in one to three months on the job with reduced public contact [and] within physical limitations."  [Doc. No. 11-3, at p. 15.]

Dr. Nusbaum examined plaintiff and completed an assessment form on July 18, 2018.  [Doc. No. 11-7, at pp. 159-160.]  At this time, plaintiff indicated he had constant

1   pain in his lower back and lower extremities and his low back pain was seldom below a 6
2   on a 10 scale.  [Doc. No. 11-7, at p. 159.]  Dr. Nusbaum's report states in part as follows:
3   "There was pain over the lumbar and lumbrosacral paravertebral musculature.  Kemp's
4   and Gaenslen's test were positive for back pain.  Straight leg raising test was positive
5   bilaterally.  Dejerine's test was negative.  Lumbar spine ranges of motion [flex 30; ext 0;
6   right bend 05; left bend 10].  Deep tension reflexes were trace for patellar and absent for
7   Achilles bilaterally. . . .  Motor strength evaluation revealed 5/5 strength for hip flexors,
8   quadriceps, tibialis anticus, EHLs, peroneals, gastric-soleus, and hamstrings.  The patient
9   was able to heel and toe walk. . . ."  [Doc. No. 11-7, at p. 159.]  Dr. Nusbaum's view was
10  that plaintiff could return to modified work as of July 18, 2018 with no lifting over ten
11  pounds; no repetitive bending; and no driving of commercial vehicles.  [Doc. No. 11-7, at
12  p. 160.]

13         On September 13, 2018, plaintiff sought primary healthcare, a physical
14  examination, and medication refills through the Department of Veterans Affairs in La
15  Jolla, because he lost his job and no longer had health insurance.  [Doc. No. 11-7, at
16  p. 135.]  Plaintiff complained of anxiety; panic attacks; chronic low back pain with
17  burning and numbness radiating into his legs and inability to walk for more than 20 feet
18  without rest because of pain; and chest pressure and shortness of breath associated with
19  anxiety and panic attacks.  [Doc. No. 11-7, at p. 136.]

20         On September 26, 2018, after plaintiff filed his request for reconsideration of his
21  disability claim, G. Rivera-Miya, M.D., an agency physician, concluded based on the
22  evidence in the record that plaintiff could "sustain at unskilled work for 40 [hours per
23  week], work with co-workers/supervisors and avoid hazards" but "would function best
24  with limited public contact."  [Doc. No. 11-3, at pp. 25-26; 29-32.]  Although
25  acknowledging that a prior assessment indicated plaintiff could perform his past work as
26  a truck driver, Dr. Rivera-Miya concluded plaintiff would no longer be able to work as a
27  truck driver because a review of his mental capacity indicated he was only capable of
28  "unskilled work."  [Doc. No. 11-3, at p. 33.]  Dr. Rivera-Miya further concluded plaintiff

could perform at least three other occupations available in significant numbers in the national economy (laundry worker; drier operator; and cotton machine operator).  [Doc. No. 11-3, at p. 33.]  Therefore, Dr. Rivera-Miya determined plaintiff was not disabled, because his condition was not severe enough to prevent him from working.  [Doc. No. 11-3, at p. 34.]

On October 11, 2018, while plaintiff's request for reconsideration of his disability claim was pending, L. Tanaka, M.D., an agency physician, completed a residual functional capacity assessment, and concluded based on the record that plaintiff could occasionally lift and carry 50 pounds; frequently lift and carry 25 pounds; stand, walk, and sit about 6 hours in an 8-hour workday; frequently climb stairs, balance, bend at the waist, kneel, and crouch; and occasionally crawl and climb ladders etc.  [Doc. No. 11-3, at pp. 28-29.]

Dr. Nusbaum examined plaintiff and completed an assessment form on December 10, 2018.  [Doc. No. 11-7, at pp. 155-156.]  At this time, Dr. Nusbaum reported that plaintiff's condition had not improved since his last evaluation.  He still had constant pain in his lower back and lower extremities.  Plaintiff rated his back pain as an "8 or 9 on a 10 scale in severity at rest."  [Doc. No. 11-7, at p. 155.]  Dr. Nusbaum's report states in part as follows:  "There was pain over the lumbar and lumbrosacral paravertebral musculature.  Kemp's and Gaenslen's test were positive for back pain.  Straight leg raising test was positive bilaterally.  Dejerine's test was negative.  Lumbar spine ranges of [motion] are markedly limited with pain.  He uses a walker routinely to assist with ambulation.  Deep tendon reflexes were trace for patellar and absent for Achilles bilaterally. . . .  Motor strength evaluation revealed 5/5 strength for hip flexors, quadriceps, tibialis anticus, EHLs, peroneals, gastric-soleus, and hamstrings.  The patient was able to heel and toe walk. . . ."  [Doc. No. 11-7, at p. 155.]  Dr. Nusbaum's view was that plaintiff could return to modified work as of December 10, 2018 with no lifting over ten pounds; no repetitive bending; and no driving of commercial vehicles.  [Doc. No. 11-7, at p. 156.]

For purposes of a worker's compensation claim, plaintiff was examined and evaluated on April 3, 2019 by Lynn E. Wilson, M.D., at Orthopaedic Associates Medical Group. [Doc. No. 11-8, at p. 10.] Plaintiff arrived for his appointment with Dr. Wilson using a walker. He reported constant "ten over ten" low back pain and pain down both legs with the right leg hurting more than the left, and difficulty with many activities, including dressing, climbing stairs, and driving. [Doc. No. 11-8, at p. 14.] He indicated he could only tolerate sitting and standing for five to ten minutes but could walk for about 30 minutes. Although he said he is awakened at night because of back pain, he is generally more comfortable when lying down. Plaintiff also complained of numbness, tingling, and loss of strength in his lower back, legs, and feet. With respect to activities of daily living, plaintiff said he does not get dressed, washes with difficulty, and lays down most of the day. His activity level was described as "extremely light," because he cannot participate in social or recreation activities, can only walk short distances, has trouble sitting and climbing stairs, and can only lift and carry light objects for a short time. [Doc. No. 11-8, at pp. 14-15, 17-19.]

For his appointment with Dr. Wilson, plaintiff brought an MRI scan report with him that was "performed at Steven MRI & X-ray" and dated April 3, 2019. [Doc. No. 11-8, at p. 30.] Dr. Wilson indicated that the MRI scan report revealed the following: "[A] two to three-millimeter disc protrusion at L3-4 with moderate spinal stenosis and bilateral foraminal narrowing;" "a three-millimeter disc protrusion with severe posterior element hypertrophy resulting in mild spinal stenosis and moderate bilateral neural foraminal narrowing" at L4-5; and a "five to six-millimeter broad-based disc extrusion with an extended disc component focally extending inferiorly measuring approximately thirteen millimeters in cranial length resulting in mild spinal stenosis and moderate bilateral neural foraminal narrowing." [Doc. No. 11-8, at p. 30.]

In the physical examination section of her report, Dr. Wilson noted plaintiff had poor balance, leaned forward over a walker, walked with an antalgic gait, could not stand erect, had a very limited range of motion in his lumbosacral spine, prominent varicose

veins, swelling in both calves, and was unable to walk on his toes or heels.  Dr. Wilson
noted that the circumference of plaintiff's thighs and calves were even on both legs, but
he did have some "weakness in both great toes," feet, and calves.  [Doc. No. 11-8, at
p. 32.]  "His reflexes [were] absent including knee jerks and ankle jerks."  [Doc. No. 11-
8, at p. 32.]  In a sitting position, he could not do a straight leg raise.  His straight leg
raise was "only 20 degrees with increased low back pain."  [Doc. No. 11-8, at pp. 31-32.]

Dr. Wilson concluded plaintiff has a "recurrent disc herniation at L5-S1 level and
an extruded disc resulting in central spinal stenosis at the L5-S1 level" and "disc
protrusions with spinal stenosis on the MRI scan as cited, dated February 4, 2019."  [Doc.
No. 11-8, at p. 33.]  In Dr. Wilson's view, plaintiff was "temporarily totally disabled" and
this disability was caused by "cumulative trauma work-related from operating a truck . . .
on uneven surfaces and on bumpy roads."  [Doc. No. 11-8, at p. 33-34.]  If plaintiff was
not obese, Dr. Wilson would have recommended "a neurosurgical consultation to remove
the extruded fragment at the L5-S1 level," because she believes with a "reasonable
medical probability" that this is the primary source of plaintiff's low back pain.  [Doc.
No. 11-8, at pp. 34-35.]  She recommended "pool therapy," a trial of acupuncture, and a
weight loss program supervised by a physician.  She did not believe he was a good
candidate for epidural injections.  If he achieved "substantial" weight loss, Dr. Wilson
stated plaintiff "may be a candidate for lumbar laminectomy and discectomy at the L5-S1
level."  [Doc. No. 11-8, at p. 34.]  Finally, Dr. Wilson mentioned that she agreed with
Dr. Fields, who performed a "Qualified Medical Evaluation" in 2018 and reached a
similar conclusion.  [Doc. No. 11-8, at pp. 19-20, 35.]

On October 3, 2019, just prior to the hearing before the ALJ on October 15, 2019,
plaintiff was examined by Jeffrey Deckey, M.D. at the Orthopaedic Specialty Institute
regarding his lumbar spine, and he complained of "10/10" pain in his low back and legs.
Plaintiff told Dr. Deckey his symptoms started while he was working as a truck driver, so
Dr. Deckey's belief was that plaintiff was reporting a "cumulative trauma injury."  [Doc.
No. 11-7, at p. 175.]  Plaintiff said he was taking meloxicam for pain and had not recently

had any physical therapy or an epidural injection.  Dr. Deckey noted plaintiff was using a walker to ambulate and "demonstrate[d] pain with bilateral leg range of motion."  [Doc. No. 11-7, at pp. 175-176.]

"Five view lumbar spine x-rays" were taken at Dr. Deckey's office on October 3, 2019, and the results demonstrated "a slight spondylolisthesis at L4-5 and severe hip osteoarthritis."  [Doc. No. 11-7, at p. 177.]  Dr. Deckey's report also referred to a "[l]umbar spine MRI taken [at] Carlsbad Imaging Center on February 4, 2019," which demonstrated "L5-S1 facet hypertrophy causing bilateral foraminal stenosis, left over right, as well as facet arthritis at L3-4 and L4-5."  [Doc. No. 11-7, at p. 177.]

Based on his physical examination, the x-rays, and the MRI, Dr. Deckey told plaintiff that "weight loss is the most important thing he could do to improve his symptoms," and he recommended plaintiff lose 150 pounds.  Dr. Deckey also recommended that plaintiff see a hip specialist because of the arthritis and maximize conservative treatment options, including physical therapy, epidurals, and other pain management options.  He did not recommend any surgery "at this time."  [Doc. No. 11-7, at p. 177.]

## IV.    *The ALJ's Decision.*

The ALJ followed the Commissioner's five-step sequential evaluation process for determining whether an applicant is disabled under this standard.  20 C.F.R. § 404.1520(a).  At steps one and two, the ALJ concluded that plaintiff has not engaged in substantial gainful activity since October 1, 2017, and he has the severe impairments of lumbar degenerative disc disease with lower extremity pain (post 1996 lumbar surgery); depressive disorder; and anxiety disorder.  [Doc. 11-2, at p. 18.]  The ALJ also noted that plaintiff suffers from several "medically determinable physical impairments" -- hypertension; obesity; sleep apnea; and mild alcohol abuse, but these impairments "do not cause more than minimal limitation in his ability to perform basic work activities and were therefore nonsevere."  [Doc. No. 11-2, at p. 19.]  In addition, the ALJ concluded plaintiff's obesity did "not constitute a severe impairment, as it does not significantly

limit [his] ability to perform basic work activities" particularly because he was "working with a similar BMI for several years." [Doc. No. 11-2, at p. 19.]

At step three, the ALJ concluded that plaintiff's impairments do not meet or equal any of the relevant listings in the SSA's Listing of Impairments. [Doc. No. 11-2, at p. 19-20.]  In this regard, the ALJ considered Listing 1.02, which governs impairments involving a major dysfunction of a joint, and Listing 1.04, which governs disorders of the spine.  The ALJ determined plaintiff does not meet Listing 1.02, because his records do not included evidence of an inability to ambulate effectively.  With respect to Listing 1.04, the ALJ said plaintiff does not meet the requirements, because:  "There is no evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and positive straight-leg raising test; spinal arachnoiditis; or lumbar spinal stenosis resulting in pseudoclaudication with inability to ambulate effectively. . . ."  [Doc. No. 11-2, at p. 20.]

At step four, the ALJ must determine the claimant's residual functional capacity to work based on all impairments, including impairments that are not severe. 20 C.F.R. § 404.1520(e), § 404.1545(a)(2).  Residual functional capacity is "the most [an applicant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1).  As part of this assessment, the ALJ must determine whether the applicant retains the residual functional capacity to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv).

Here, the ALJ concluded plaintiff is unable to perform his past relevant work as a truck driver "[d]ue to his mental limitations," but he does have the residual functional capacity to perform medium work "as defined in 20 CFR 404.1567(c), except [plaintiff] can frequently climb ramps or stairs; can occasionally climb ladders or scaffolds; can never climb ropes; can frequently balance, stoop, and crouch; can occasionally crawl and kneel; is limited to work involving simple, routine tasks; and can have only occasional interaction with supervisors, coworkers, or the public." [Doc. No. 11-2, at pp. 21, 26.]

/ / /

If the applicant cannot perform past relevant work, the ALJ at step five must consider the residual functional capacity assessment, along with the applicant's age, education, and work experience, to determine whether the applicant could "make an adjustment to other work" that is available in significant numbers in the national economy.  20 C.F.R. § 404.1520(a)(4)(v); 42 U.S.C. § 1382c(a)(3)(B).  While the applicant carries the burden of proving eligibility at steps one through four, the burden at step five rests on the agency.  *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003). Since the ALJ concluded plaintiff is unable to perform his past relevant work and is impeded from performing a full range of medium work by other the limitations or restrictions listed above, he made a finding at step five of the disability analysis.

"To determine the extent to which [the above-listed] limitations erode the unskilled medium occupational base, the [ALJ] asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.  The vocational expert testified that given all these factors the individual would be able to perform the requirements of representative occupations, including garment marker; laundry worker; and hand packager.  [Doc. No. 11-2, at p. 27.]  Based on the record and the testimony of the vocational expert, the ALJ concluded at step five that plaintiff is not disabled, because he has the capability to make a successful adjustment to other work that exists in significant numbers in the national economy.  [Doc. No. 11-2, at p. 27.]

## V.   *Discussion.*

Plaintiff complains that the ALJ found Dr. Curran's opinion persuasive but did not incorporate into the residual functional capacity assessment Dr. Curran's opinion that plaintiff could only bend occasionally at the waist.  Plaintiff further complains that the ALJ did not explain why he did not incorporate this finding into the residual functional capacity assessment.  [Doc. No. 15, at p. 7.]  As noted above and as plaintiff contends, the ALJ's residual functional capacity assessment states that plaintiff "can frequently . . . stoop. . . ."  [Doc. No. 11-2, at p. 21.]  In support of this argument, plaintiff cites Social

1   Security Rule 85-15, which explains that "stooping" involves "bending the body

2   downward and forward by bending the spine at the waist." [Doc. No. 15, at p. 8.] This

3   Ruling also explains that some stooping "is required to do almost any kind of work,

4   particularly when objects below the waist are involved and that "most" medium level

5   jobs require a person to "be able to stoop frequently." [Doc. No. 15, at p. 7.]

6        Defendant contends that plaintiff's argument fails, because he would still be able to

7   perform work existing in significant numbers in the national economy even if the ALJ

8   erred by failing to incorporate into the residual functional capacity assessment

9   Dr. Curran's finding that plaintiff should only do occasional bending at the waist. Citing

10  the vocational expert's testimony and the Dictionary of Occupational Titles, defendant

11  contends plaintiff would still be able to perform two out of the three representative

12  occupations mentioned by the vocational expert (*i.e.*, laundry worker and hand packager),

13  because they require no stooping. Thus, defendant argues any error in this regard was

14  harmless. [Doc. No. 18, at pp. 5-6.] However, the Court was unable to verify the

15  physical requirements for the listed positions based solely on a review of the Dictionary

16  of Occupational Titles. The Court therefore agrees with plaintiff that the ALJ's residual

17  functional capacity assessment is not supported by substantial evidence, because the

18  record does not support a finding that plaintiff could bend frequently at the waist.

19       Next, plaintiff argues that the ALJ's residual functional capacity assessment is not

20  supported by substantial evidence, because he did not consider or explain his reasons for

21  rejecting "the presence of medical deterioration" as evidenced by "later objective

22  findings [cited in Dr. Wilson's medical evaluation that] point to a qualitatively different

23  medical status." [Doc. No. 15, at p. 9.] Plaintiff also contends that the ALJ did not state

24  legitimate reasons for concluding that Dr. Wilson's medical opinion was unsupported by

25  the objective record, particularly when he cited "diagnostic scans [that] speak for

26  themselves." [Doc. No. 15, at p. 7.] In plaintiff's view, the "objective radiographic

27  findings summarized by Dr. Wilson are inconsistent with the medium residual functional

28  capacity assessed by the ALJ." [Doc. No. 15, at p. 9.] Plaintiff also points out that these

"diagnostic scans" were not available earlier in the claims process when Dr. Curran, Dr. Vu, and Dr. Tanaka completed their evaluations.  [Doc. No. 15, at p. 7.]

"[A]n ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence. The agency must 'articulate . . . how persuasive' it finds 'all of the medical opinions' from each doctor or other source, 20 C.F.R. § 404.1520c(b), and 'explain how [it] considered the supportability and consistency factors' in reaching these findings, *id.* § 404.1520c(b)(2)."  *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

With respect to plaintiff's physical condition, the ALJ was most persuaded by the May 30, 2018 opinion of examining physician, Dr. Curran, who concluded plaintiff was capable of medium work with some limitations, such as bending at the waist only occasionally.[2]  In the ALJ's view, Dr. Curran's opinion was persuasive because it was supported by objective evidence, including his own examination of plaintiff, and by plaintiff's history of back pain, which would preclude heavy lifting but not all other competitive work.  The ALJ also found persuasive Dr. Curran's statements that plaintiff had full strength in his extremities and was able to walk without an assistive device when he appeared for this examination on May 30, 2018.  [Doc. No. 11-2, at p. 24.]

The ALJ found unpersuasive the opinion of Dr. Nusbaum on April 25, 2018 that limited lifting to no more than ten pounds, precluded repetitive bending, and allowed for alternating between sitting and standing.  In the ALJ's view, the objective evidence did not support this level of restriction, because plaintiff had full strength in his extremities, was not using an assistive device when examined by Dr. Curran, could drive a car, and

---

[2]     The ALJ was also persuaded by the opinions of two non-examining agency medical consultants (Dr. Vu and Dr. Tanaka).  For the most part, their opinions were consistent with those of Dr. Curran.  The ALJ found their opinions "persuasive because they are consistent with and supported by the objective medical evidence."  [Doc. No. 11-2, at p. 24.]

1    was independent with personal care.  [Doc. No. 11-2, at p. 25.]  The Court notes also that

2    Dr. Nusbaum examined plaintiff on a regular basis, and the ALJ's decision does not

3    indicate whether he found persuasive or unpersuasive Dr. Nusbaum's opinions from other

4    dates when he examined plaintiff.

5         The ALJ was the least persuaded by Dr. Wilson's April 3, 2019 opinion, which

6    concluded plaintiff was "temporarily totally disabled."  [Doc. No. 11-2, at p. 25.]  The

7    ALJ found Dr. Wilson's opinion was "unpersuasive because it is inconsistent with and

8    not supported by objective medical evidence" and was "too general to be of assistance in

9    assessing the claimant's residual functional capacity."  [Doc. No. 11-2, at p. 25.]

10   However, the Court notes that Dr. Wilson's opinion was supported by objective evidence

11   in the form of an MRI and an X-ray, which were not available to Dr. Curran.  It is true

12   Dr. Wilson did not make specific recommendations on the nature and extent of plaintiff's

13   physical limitations and how they would impact his ability to perform work-related tasks.

14   However, it is the ALJ's role to assess a claimant's residual functional capacity "based on

15   all the relevant evidence" in the case file (20 C.F.R. § 404.1545(a)(1)&(3)), and

16   Dr. Wilson did make specific findings based on the MRI, the X-ray, and a physical

17   examination of plaintiff that would likely impact the ALJ's residual functional capacity

18   assessment.  [Doc. No. 11-8, at pp. 30-31.]  For example, based on her review of

19   plaintiff's medical records, the MRI, the X-ray, and a physical examination of plaintiff,

20   Dr. Wilson said she would recommend surgery if plaintiff was not obese "to remove the

21   extruded fragment at the L5-Sl level."  [Doc. No. 11-8, at p. 34.]  Dr. Wilson believed

22   with a "reasonable medical probability" that the "extruded fragment at the L5-S1 level is

23   the primary source of plaintiff's low back pain."  [Doc. No. 11-8, at p. 34.]

24        In support of his finding that Dr. Wilson's opinion was unpersuasive, the ALJ also

25   noted that plaintiff had full strength in his extremities and was not using an assistive

26   device during the consultative examination by Dr. Curran.  [Doc. No. 11-2, at p. 25.]

27   Without more, this is not a legitimate reason for rejecting Dr. Wilson's opinion.  The ALJ

28   found that plaintiff suffered from the severe impairment of "lumbar *degenerative* disc

1   disease with lower extremity pain." [Doc. No. 11-2, at p. 18 (emphasis added).]

2   Dr. Curran's examination was completed on May 30, 2018, and Dr. Wilson's

3   examination was completed on April 3, 2019, almost one year later, and, as plaintiff

4   contends, degeneration (*i.e.*, deterioration of plaintiff's condition) could explain the

5   differences in the two opinions.  In other words, without more, it does not appear the ALJ

6   considered the possibility that Dr. Wilson's medical opinion, which was supported by

7   objective evidence (*i.e.*, an MRI and x-rays) that was not previously available, reveals

8   significant medical developments that occurred after Dr. Curran's evaluation and after

9   plaintiff's medical records were reviewed by the agency's physicians.

10       The ALJ also rejected Dr. Wilson's opinion because the objective medical

11   evidence "does not support the use of a walker" even though the record indicates that an

12   "assistive device" was prescribed.  [Doc. No. 11-2, at p. 25.]  This reason is nonsensical

13   and, without more, it is not a legitimate reason for rejecting Dr. Wilson's opinion.

14       Although plaintiff did not address the issue in his moving papers, the Court notes

15   that the ALJ's decision also does not include legitimate reasons for what appears to be a

16   rejection of the medical evaluation of Dr. Deckey.  As outlined above, Dr. Deckey

17   examined plaintiff on October 3, 2019, shortly before the hearing on October 15, 2019,

18   and more than a year after the examination by Dr. Curran on May 30, 2018.  While the

19   ALJ's decision does summarize Dr. Deckey's medical opinion, it does not state whether

20   he found it persuasive or unpersuasive and why.  Thus, without more, it appears that the

21   ALJ also rejected Dr. Deckey's opinion without stating legitimate reasons for doing so.

22       As noted above, "an ALJ cannot reject an examining or treating doctor's opinion as

23   unsupported or inconsistent without providing an explanation supported by substantial

24   evidence. The agency must 'articulate . . . how persuasive' it finds 'all of the medical

25   opinions' from each doctor or other source, 20 C.F.R. § 404.1520c(b), and 'explain how

26   [it] considered the supportability and consistency factors' in reaching these findings, *id.*

27   § 404.1520c(b)(2)."  *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

28   / / /

1    The only comment by the ALJ on Dr. Deckey's medical evaluation is that it "did

2    not offer an opinion on the claimant's residual functional capacity." [Doc. No. 11-2, at

3    p. 23.]  Once again, the ALJ's role is to assess a claimant's residual functional capacity

4    "based on all the relevant evidence" in the case file.  20 C.F.R. § 404.1545(a)(1)&(3).

5    Dr. Deckey's opinion is supported by objective evidence (five-view lumbar spine x-rays

6    and an MRI) and a physical examination.  Based on x-rays, Dr. Deckey said plaintiff

7    needed to see a hip specialist "due to the severe hip osteoarthritis seen on his x-rays."

8    [Doc. No. 11-7, at p. 177.]  Like Dr. Wilson's evaluation, Dr. Deckey's medical opinion

9    may reveal significant medical developments that occurred after Dr. Curran's evaluation

10   and after plaintiff's medical records were reviewed by the agency's physicians.  The

11   ALJ's decision does not only lack legitimate reasons for rejecting Dr. Deckey's opinion,

12   it also does not address whether and to what extent the "severe hip osteoarthritis" shown

13   in the x-rays impacts the residual functional capacity assessment.

14   In sum, for the reasons outlined herein, the ALJ's residual functional capacity

15   assessment is not supported by substantial evidence.  The ALJ failed to provide

16   legitimate reasons supported by substantial evidence for rejecting the medical opinions of

17   examining orthopedic physicians, Dr. Wilson, and Dr. Deckey, as well as examining and

18   treating chiropractor, Dr. Nusbaum.

### ***Conclusion***

19

20   Based on the foregoing, the Court finds that the ALJ's residual functional capacity

21   assessment is not supported by substantial evidence, and it is therefore unclear whether

22   plaintiff is disabled.  Therefore, it is appropriate to remand the case for further

23   development of the record.  *See, e.g.*, *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d

24   1090, 1105 (9th Cir. 2014) (remand for further development of the record is appropriate

25   where the ALJ makes a legal error and there are outstanding issues that make it

26   "uncertain or ambiguous" as to whether the claimant qualifies for benefits).  Accordingly,

27   IT IS HEREBY ORDERED that plaintiff's request for reversal and remand is

28   GRANTED [Doc. No. 15] and defendant's request for an affirmance of the

1  Commissioner's final decision is DENIED [Doc. No. 18].  The Clerk of the Court shall

2  enter judgment accordingly and terminate the case.

3      IT IS SO ORDERED.

4  Dated:  June 24, 2022

5

6      Hon. Karen S. Crawford
       United States Magistrate Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

20cv2257-KSC